It is alright. Hear ye, hear ye, hear ye, this Honorable Kelly Court for the second tradition visit is now back in session pursuant to adjournment. The Honorable Susan Hutchinson presides. Please be seated. Your Honor, in this case, I would like to get to 17-0064, in the name of Mr. Chadwick v. Nelson, Defendant's Accomplice. Arguing on behalf of the Defendant's Accomplice, Mr. Lester S. Weinstein. Arguing on behalf of the Accomplice, Mr. Chadwick v. Hutchinson. Good afternoon, gentlemen. You will notice, as in the last oral argument, we have an empty seat. Justice Hudson is in the building. He is engaged in some other activity on behalf of the Court. He may join us, but in any event, he will listen to the tapes, and we will consult with him before we issue a decision in this case. So, if we're ready to proceed, Mr. Weinstein, we are ready. May I go, Your Honor? Yes, please. Good afternoon. Good afternoon. If it pleases the Court, Counsel, for the record, as has been stated, I'm Lester Weinstein from Lawson, Illinois, and I represent the appellant in this case. This case is an unusual case because it's an ordinance violation, village of Chadwick ordinance violation. It's a nuisance violation case. It's very unusual for cases like this to be brought up on appeal. I've been practicing law in this area for 53 years, and during and active in trial, and I have lost my share of cases. And, you know, some of those losses, you remember a little longer than others. Well, at the sunset of my career, and I said I was going to write a book someday, and the book that I was going to write, I didn't know was going to be called The Last Appeal. Well, here we are. Oh, I think somebody else took that one. Ah, too many. I got to know, I think he's got something called The Last Appeal. Well, my last appeal is called, and it's open to Chadwick versus Nelson. And the loss of this case as an ordinance violation case, could not, in the appellant's position, and I support that position vehemently, could not go unattended by a higher court. What did the village do to your client? Ah, the village basically confiscated property without due process. Now, that's a constitutional issue, but the village of Lafayette's appellate court, second appellate district, third appellate district, um, stated the macro issues about the Illinois Farm Nuisance Suit Act much more eloquently than I could. Actually, the act itself is eloquent in and of itself. Um, in approaching a problem, my general analytical process is to take the macro view and work down into the micro view. And I generally come out with the critical issues of law and the critical issues of fact. Some cases have both critical issues of law and facts. Some just have critical issues of law, critical issues of fact. At any rate, so I say, how am I going to approach this unusual case? Um, because to me, the case is obvious. And the village of Lafayette versus Brown, I think, speaks volumes. If I ever saw a case, except for one issue, which, uh... Well, I wonder if we agree on the same issue. The question that was raised there and which may be raised here is, what change occurred in the surrounding area of this property? Your Honor, in my opinion, having tried this case, there is no change that was changed in the surrounding geographic area. The only change was the enactment of the village ordinance, making a perfectly acceptable agricultural activity a nuisance. Without the requirement and without respecting the Illinois Farm Nuisance Act. Okay. Before that act was passed, had your clients been raising calves on the property? Yes. For how long? About nine months. Okay. Um, was there a change in the use of the property for them to start raising calves there? Your Honor, it is the appellant's position that the answer to that question is absolutely no. There was agricultural use before for over two years, which never ceased. Now, that agricultural use you're talking about is baling hay? Baling hay. Would you... and that is, it's on a two and a half acre plot, right? Well, two and a half to five acre plot. Well, what is it? How big is it? It's actually five. Okay, five acres. How much of that is used to bale hay, to raise alfalfa and bale it or whatever it is? Uh, there's probably half of it or maybe more than half. There is a building that was put on it, which is kind of a portable modular building. So two, two and a half acres? Yeah. Okay. Would you say that that... and I think the testimony had been that there was income of ten dollars for each round bale of hay. They had between five and eight bales of hay every six months. So you're talking about fifty to eighty dollars of income over that six month period, right? Yes, Your Honor. Okay. Would you say that that is a de minimis amount or a de minimis use of the property for agricultural purposes? I say that it fits within the protection and the intent, the legislative intent of the Farm Nuisance Suit Act. The Farm Nuisance Suit Act is not just a protective act. It is a nurturing act. And it does not require, nor does it say, does it qualify or classify or quantify the amount of activity it takes to be a farm. The Nuisance Suit Act, for instance, in section one, it says its legislative intent is to conserve and protect and encourage. That's nurturing the seed that you put in the ground, whether it's a thousand bags of seed or one. It nurtures it because it could grow into a farm. We go ahead. The act goes in further. It says it's agricultural land for the production of food or other agricultural products. This is designed and intentionally, the purpose of the act is to reduce the loss of the state of its agricultural resources. I think that is a clear statement of intent. It says nothing about how much has to be raised. It says nothing about what has to be raised. It has to be agricultural in nature. Susan Hay, particularly as the court has read the file and looked at the exhibits, this Two sides. The other two sides are blocked by a chemical, agricultural chemical plant, large chemical plant, and storage rentals. You can't even see the village of Chadwick from this property. Was this property owned by the village at one point in time? It was, yes. And what did they do with it when they had it? They stored stuff. They dumped stuff. I mean, they dumped extra materials. That portable building wasn't on it then, was it? No, my client moved it on after they bought it. If I may, I'd like to go on to the second section of the act. It says, Your Honors, the term farm, quote, as used in this act means any emphasized supply, any parcel of land, not a big parcel, not a huge parcel. There is no definition of a de minimis parcel. It is any parcel of land used for the growing, which hay is, and harvesting, which was done of crops for the feeding, breeding, etc. So, Your Honor, your question was precisely on point, and it's precisely covered by section 2 of the act. The issue, which I think is the link in this case, is what the judge said. So I'm going to go micro for a minute, if I may. And I would like to refer the court to the record page 83. And this is the trial judge starting at line 16, where he says, What we have here is Mr. and Mrs. Nelson have this piece of ground. I can't remember how many acres it is, but it's not much. Maybe it's five, maybe it's 10. It's in the village limits, though, and they've had it for a few years, three years. And they let Mr. Ron come in and mow the grass and take the bales out, which he takes five to eight twice a year. This year, we only got one. One cut, so we only took five or eight bales. Here is the critical aspect. The judge really states the appellant's position. That's technically, I guess, a farming operation. This is out of the judge's mouth, from the bench, in support of his decision. And that means that the prior activity was acknowledged by the trial judge, saying that that activity is now tackable to a subsequent farming activity. That's if the judge read the app properly. It's our position as the appellant, they err. At that point, when he did not allow tacking, he said the change was because it's a different agricultural activity than haying the ground. Having cattle on the ground is a different activity than haying the ground. The Farm Nuisance Suit Act does not provide for that type of interpretation in the appellant's position. So. Well, the Illinois Supreme Court has said that this act, unlike some of the others that are joining us in the states, is really a right to farm law, the Farm Nuisance Action Act. And wouldn't it, I mean, what's happening here, at least by this ordinance, is it would appear that if this was a farm before, and there is some theory that it is, by making it now a nuisance, there's no issue of negligence. They are preventing the right to farm. Correct. That is our position. But don't we still need something that's happened? The Supreme Court went on to say in the Toftoy case that right to farm acts are sometimes considered coming to the activity by city slickers, when we don't understand we're going to be next to a hog confinement operation or a, you know, a cow feedlot, because they're not the most pleasant things in the world. Nothing like that has happened in this village prior to this particular ordinance. In order to properly determine the legislative intent stated by the legislature with regard to that exact issue, that aspect of the act set up part of the protective aspect of the intent of the act, which creates the right to farm portion that the Supreme Court was talking about. It does everything left the same. If there are two farm activities, the act protects it in case a village decides that that is a nuisance. What happens if the village... Go ahead. You may proceed. What happens if the village, instead of calling it a calf operation, instead of that, it says there can be no, like in the Lafayette case, no farming at all. The Lafayette case would control. There would be little movement. I think that the protective aspect of the act protects the farming operation, the growing farm operation, expanding from a change in the surrounding encroaching gentrification properties. That's our position. And the other issue, if I may, before the hope comes out and grabs me away, the other issue is, is that there is no testimony of any other nuisance activity emanating from this ground. The nuisance activity is, was, there was the chief of police testifying under cross examination that there was no other problems on that property. Now, if the nuisance was only created by the enactment of the nuisance ordinance, and I had entered into the record every nuisance ordinance of the village of Chattanooga, everyone. And there was no violations from the, from the police chief. So it's our opinion that the judge misread the act, misapplied the act. There was no evidence of a feedlot. He's the only one that ever stated the phrase feedlot, cabinet feedlot. There was, so there's no testimony to support the judge's decision on a trial procedure basis. There's an error in the way the trial judge, in our humble opinion, interpreted the application of the Fire Nuisance Act. So thank you for your time. And thank you for your questions. You'll have an opportunity to respond after Mr. Jensen is finished, if you so choose. Thank you. If it please the court and counsel, I am Phil Jensen. I am Chattanooga's interim village attorney. On those occasions, when I disagree with counsel, I do so with some fear and trepidation. But in this instance, his legal analysis is flat wrong. Before you is a case in which the village of Chadwick, using its police powers, passed an ordinance that bars commercial livestock raising within the village limits. Well, what is commercial livestock raising? Certainly, I would submit 19 feeder calves, Justice Hutchinson. I mean, but it mentions a whole lot of other things. I would say almost any farm you can think of has some aspect of a commercial prospect. They're using some of their grain for their own animals, possibly, even their domestic animals. But I mean, how can we just try to remove commercial when we don't really have a good definition of commercial? Justice, if you're alluding to the Lafayette case, I think it's very clear that the actions of the village of Chadwick in this instance did not prohibit farming as a whole. Grain operations could continue unabated. The nuisance defined by Chadwick was the raising of cattle, chickens, hogs, and the like. Those sort of farming activities, I trust we would all agree, would be far more intensive than a grain operation. In any event... Except for the spiders and stuff in the grains. Well, I would grant that. Justice, did you have a question? I was just going to ask you, was it an agricultural use of the property to bale the hay? Justice, let me go back a step. I would submit that your reference to the prior, quote, agricultural activity being de minimis is spot on to suggest that a property that for 24 years is used for non-agricultural use, followed by, in a light most favorable to the defendants, 8 to 10 bales of hay, and it may have even been grass, 8 to 10 bales of grass as a result of hand seeding, not cultivation as we normally understand it, 8 to 10 bales of grass constituting an agricultural activity yielding $50 to $100 a year, I think, specifically would be deemed de minimis. Let me suggest this, though. Though I would assert that the Farm Act does not apply because there had not been farming activity going on for one year prior to the cattle, there are numerous reasons I will suggest that even if you apply the Act as a whole, its application does not legitimize the action that was being taken, that is being taken, that was taken by the defendants. I believe the assertions of the defendant are wrong for at least three reasons. First of all, the Illinois Farm Nuisance Act doesn't apply in this case because the farming activity was de minimis if there was farming activity at all. The statute under Section 3 clearly requires that farming activity take place for one year. We know that for the 24 years that the village occupied the premises, there was no farming activity whatsoever. Is that in the record? Yes, that is in the record. We know that at the time that the defendants acquired the property, the express use for the property was a fire training facility. When that didn't get off the ground, they hosted one or two rock concerts on the property. It was only then that they graded a portion of this parcel, hand seeded some grass or hay, and then claimed over a period of two years to have removed a de minimis amount of grass. Okay, now where though in the Farm Nuisance Act do you ever see the word de minimis or do you see any quantification of property that has to be involved or dollar amount that has to be received? Justice Hutchinson, you do not. That is not what I'm hanging the village's position on. It's on the following two points, if I may. Even if you find that there was the requisite farming activity necessary for one year to warrant the application of the act, it doesn't shield the defendant's action from the city's nuisance prosecution for two reasons. First of all, this is not a case where non-ag land uses have extended into an agricultural area, something that the purpose of the act is to protect. This is not a case of urban sprawl meeting a long existing farm activity. This is a parcel of land within municipal limits, never used for agricultural purposes, maybe used for a de minimis purpose that now became the site of a cattle feedlot. There was no history of agricultural use in our position or as we assert. Secondly, there are no changed conditions in the surrounding area occurring after the farm had been in operation for more than a year. Even if you find that the de minimis farming activity is sufficient to come under the umbrella of the act, there are no changed conditions in the surrounding areas. The Farm Act should not be construed to protect agricultural activity when there is a change in the type or character or intensity of the farming operation. I would submit that is the most significant point I wish to make. It is a point I believe that the Illinois Supreme Court has not addressed. I was going to say, has anyone addressed that? Other states have addressed that. Justice Hutchinson, for reasons I'll point out in a moment, I believe that the Lafayette case for six reasons supports the position of Chadwick as opposed to the position of Mr. Weinstein. Let me suggest something from a public policy standpoint before I move to the act and the Lafayette case. If the analysis suggested by Mr. Weinstein is adopted, a village resident who grows vegetables or grain for sale at the local farmer's market can stop growing those vegetables, replace it with a cattle feedlot on the same parcel, and be protected from the village's nuisance claims by virtue of the Farm Nuisance Act, a reasonable reading of the statute avoids that sort of interpretive train wreck. That cannot have been the intention of the legislature. The Illinois General Assembly, I don't believe, ever intended the result the appellate seeks when the Farm Nuisance Act became law. The defendant's position, I believe, is contrary to the Act's express purpose, and it also eviscerates longstanding municipal police powers that allow a village to define, prevent, and abate nuisances in furtherance of the public health, safety, and general welfare. Now, I would suggest this. Though there should be substantial deference given to a municipality exercising its police powers, that deference would not trope the application of the Farm Nuisance Act if they came to loggerheads. But they don't in this instance. Chadwick, under 65 ILCS 5111, gets to pass all necessary police ordinances. Under 65 ILCS 1160-2, it gets to define, prevent, and abate nuisances. And in this instance, using those two statutes, the village passed an ordinance defining the not the raising of grain, the raising of cattle, hogs, and the like. One component of farming, not all components of farming did it deem a nuisance. But it's that component of farming that Ms. Nelson is engaged in, and if that's the only one she's engaged in, to call it a nuisance is preventing her from farming. Justice Hutchinson, I take issue with that for the following reason. She was engaging in grain cultivation prior to putting the feeder calves on this parcel if we believe the testimony of the defendants. So a nuisance definition that precludes cattle is not a prohibition on farming per se, as was the case in Lafayette. So you're saying she could continue with the hay? Absolutely. And she could continue with vegetables, Justice Smith. She could grow grapes. She could grow apples. She could grow vegetables. Now, what is significant in this case is Lafayette, and let me address that. But first, the issue before the court is this. Defendants maintain that the cultivation of a little bit of grass constitutes the farming activity necessary to bring them under the protection of the Act and protect them from a nuisance action related to their cattle feeding operation. But this is a fundamental change in the nature of the farming operation going on there. Mr. Weinstein commends the village of Lafayette versus Brown. I would submit there are six reasons why that case supports the position of Chadwick as opposed to the defendants. First, the ordinance being considered in Lafayette prohibited all farming activities, even the ordinance does not. It only prohibits cattle and the like from being raised within the village limits. Secondly, the Lafayette case did not involve a change in the use from horticulture to livestock. This case before you does. In Lafayette, a tree farm became a corn farm, and the village attempted to prohibit all agricultural activities, even those activities that pose no demonstrable threat to the use and enjoyment of adjacent property. In Lafayette, a change of land from crops to livestock was never at issue. And let me repeat that. In Lafayette, a change from crops to livestock is never an issue. The third reason why Lafayette supports Chadwick as opposed to the defendants is this. In the court's majority, I quote, the justices said, this is not a situation where someone went from growing crops to creating a feedlot. Well, in the case before you, it is a case where somebody went from growing crops to creating a feedlot. I submit the third district would have concluded differently if the defendant had converted the tree farm to a feedlot. Fourth distinction in Lafayette that supports Chadwick's position. Justice Holdridge, in his concurring opinion, states the courts should explicitly take into account a change of use in deciding whether a particular farming operation is a protected activity. That's 27 Northeast 3rd at 695. He specifically said, justices statewide, when you construe this act in the future, I suggest you explicitly take into account a change in use in deciding whether a particular farming operation is a protected activity. Is a de minimis cultivation of grain sufficient facts to warrant the protection of the act for a feedlot? I submit no, and Lafayette doesn't stand for that proposition. Fifth reason in the dissent, Justice Leiden held that the farming operations in Lafayette didn't meet any of the requirements of the act. He asserted that his colleagues had misread the act, its intent and language. He stated that the subject land had been operated as a corn farm for less than 10 months. Justice Spence, you asked Mr. Weinstein how long there had been cattle. He said 10 months. We believe it was three months or no longer than five months before the ordinance was passed. Under either circumstance, it was less than one year. Justice Lafayette pointed out that the corn had been grown for 10 months and there had been a change in the use of land and there were no changes in the conditions of adjacent land. In this instance, it is not urban sprawl moving to the area of the cattle feedlot. May I conclude very briefly? Thank you, Justice. I commend to you one case I've cited several cases were cited in the brief, but I commend to you one case from North Carolina, Inright Dunn v. Britt 451, South East 2nd, page 1, 1994. There, a North Carolina court of appeals applied a nearly identical right to farm statute to Illinois to a circumstance where there was a change of farm operation from turkeys to hog production. In that case, that court ruled, and I quote, we do not believe the legislature intended the statute to cover situations in which a party fundamentally changes the nature of the agricultural activity. In conclusion, if the change of farm operation from grain to livestock wouldn't be protected by the Lafayette court and has not been protected in other states construing similar statutes, there's no reason why a change of use before you should be protected by the Farm Act in Illinois. It's for those reasons we ask that you affirm the decision of the trial court. We believe it is consistent with the Farm Act in many respects. It is a question of first impression, but it is a case that the Lafayette justices will support, and it's a case the North Carolina appellate court would support. That being the conclusion that the change in use is so dramatic and so intense that it warrants giving deference to the Chadwick Village Council and deeming the action a nuisance. Thank you. I have a question. You had six points, you said, on the Lafayette case. I only heard five. Did I miss the six points? Justice, let me thank you. I guess my sixth point was this. Viewed in this context, the holding in Lafayette supports the village, not the defendant. And frankly, I had said that a number of times. Thank you. Thank you.  Please, the court. Counsel. There was one interesting comment that, amongst many other interesting comments that opposing counsel has stated, but the one thing that I want to take care of immediately, the defendant appellant in this case purchased this land from the city, a public auction, and received a deed without restriction, without any covenants, without any agreements. And the fact that there was discussion about additional use, that is, in one of the cases, I think it's the Lafayette case, there was a statement that the court utilized, saying, so what? You can have lots of uses on a farm. And if you have grain or cattle, it doesn't mean you can't sell iced tea, lemonade. It doesn't mean you can't have a landing strip for planes on one part of the farm. There is nothing in the Illinois Citizens Farm Suit Act that requires exclusive use. So that statement fails. Counsel went through a multiple of points. Both, all of them, to me, seemed strained. Strained in the sense of reading words into the act which don't exist. And like I said, the Lafayette case, we'd say this much more eloquently than I in response to counsel, the best indication, as it says in the Lafayette case by the court, the best indication of the legislature's intent is the plain language of the statute. When statutory language is plain and certain, the court is not free to give it a different meaning. Additionally, a court may not depart from a plain statutory language by reading into exceptions, limitations, or conditions not expressed by the legislature. That's what we have here. That's what counsel is attempting to force this court into. And if unrestrained, the village of Chadwick can do whatever it wants, identify whatever it wants, without the requirements or the protections to the public of the protections designed and intended by the legislature in the Oral Farm Abuse and Suit Act. So what if there had been an open and notorious or several complaints about odor or noise or anything from village residents, would the village have been able to do anything? If the village provided for that circumstance in the enactment itself, it probably would be within its jurisdictional powers. But by simply identifying an act which otherwise would be protected by the Farm Nuisance Suit Act, that is preempting the legislature. It's preempting the state of Illinois. It is, by logical extension, granting absolutely unwarranted, unfettered powers to a municipal authority. I don't think that is the intention of the act. The act is a protective act, a right to farm act, and it is a nurturing act for the expansion of farming. However, the additional thing that I think is very important for a message from this court is that judicial decisions should be made based upon evidence presented. That's the nature of what we do. And in this case, unfortunately, the court seemed to make its ruling based upon evidence which was not before it, which did exist and was not presented. Thank you very much. Well, I'm asking for a reversal of the court, and I'm asking for a remand to the trial court for a hearing on damages and costs. Thank you very much. All right. Thank you, gentlemen, for your arguments this afternoon. I would say that the argument is refreshing after some of the ones we had today. However, I'm also thinking about the feedlot. It may not be so refreshing, but thank you for your time. We will make a decision in due course, and we now stand adjourned for the day. Thank you very much.